IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 24-cv-00934-PAB-CYC

POLICA HOUSTON,

     Plaintiff,

v.

DAMON SMITH, in his individual and official capacity,
MICHAEL CARTER, in his individual and official capacity,
TRAMAINE DUNCAN, in his individual and official capacity,
VICKI REINHARD, in her individual and official capacity, and
DEBBIE GERKIN, in her individual and official capacity,

     Defendants.

_____

**ORDER**
_____

     The matter before the Court is Defendants' Partial Motion to Dismiss [Docket No. 14]. Plaintiff Polica Houston filed a response, Docket No. 23, and defendants replied. Docket No. 24. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

**I. BACKGROUND**[1]

     Mr. Houston has worked as an educator for twenty-three years. Docket No. 1 at 54, ¶ 74. For the 2019–2020, 2020–2021, and 2021–2022 school years, Mr. Houston worked as an assistant principal at Gateway High School ("Gateway"), part of the Aurora Public School ("APS") system in Colorado. *Id.* at 1–3, ¶¶ 1–2, 13. Mr. Houston was qualified to be an assistant principal, having earned a bachelor's degree in English from the University of Northern Colorado and a master's degree in higher education

_____

[1] The following facts are taken from the Complaint and Jury Demand, Docket No. 1, and are presumed true for the purpose of ruling on the motion to dismiss.

from the University of Denver.  *Id.* at 3, ¶ 13.  Mr. Houston received an "Effective" rating for the 2021–2022 school year under the Colorado State Model Performance Management System Final Effectiveness evaluation.  *Id.*, ¶ 14.  Mr. Houston is black. *Id.*, ¶ 13.

From 2019–2021, Ron Fay, Gateway's principal, hired fifteen black staff members.  *Id.* at 31, 41, ¶¶ 44, 56.  APS assigned Principal Fay to mentor Mr. Houston. *Id.* at 41, ¶ 56.  Over the 2021 summer vacation, Mr. Houston traveled with Principal Fay to the University of Tennessee to upgrade Gateway's marketing and branding.  *Id.* at 38, ¶ 54.

Defendants conducted an eight-month investigation into Principal Fay and fiscal mismanagement at Gateway.  *Id.* at 30, 47, ¶¶ 40, 63.  The investigation reviewed 50,441 of Mr. Houston's emails.  *Id.* at 30, ¶ 40.  On December 8, 2021, defendants required Mr. Houston to appear for a two-hour interview regarding Principal Fay and the misappropriation of funds.  *Id.* at 47, ¶ 65.  The investigation uncovered no impropriety by Mr. Houston.  *Id.* at 30–31, ¶¶ 40, 42.  From August 2021 until January 2022, Carol Jennings split time between serving as the P-20 Learning Community Director and the interim principal at Gateway until APS hired Principal Scott Fiske.  *Id.* at 46, ¶ 59.  In 2022, defendants "used microaggressions and other tactics to get rid of all fifteen black staff members" at Gateway.  *Id.* at 31, ¶ 45.

On April 21, 2022, Mr. Houston met with defendant Damon Smith, the chief personnel officer at APS.  *Id.* at 2, 4, ¶¶ 4, 16.  At the meeting, Mr. Smith told Mr. Houston that Mr. Smith was putting a letter of reprimand in Mr. Houston's personnel file, that Mr. Smith was suspending Mr. Houston for five days without pay, and that Mr.

Smith was not allowing Mr. Houston to renew his contract. *Id.* at 5, ¶ 17. The letter of reprimand states that Mr. Houston's "attendance on the trip to Knoxville, Tennessee from June 22 – 24, 2021 was a violation of a district-wide directive which prohibited staff from taking any out of state business related trips until after June 30, 2021." *Id.* at 6, ¶ 24. The letter further states that Mr. Houston failed "to complete and submit required documentation for travel which utilizes school district funds." *Id.* The letter states that, even though Mr. Houston was "told to attend the trip," Mr. Houston's conduct demonstrated a lapse in leadership, which "warrants discipline." *Id.* The letter further indicates that, "this memorandum also serves as notice that your contract will not be renewed for the 2022–23 school year." *Id.*

No district-wide directive prohibited staff from taking out-of-state business-related trips until June 30, 2021. *Id.*, ¶ 23. Staff travel was permitted on May 17, 2021. *Id.* at 7, ¶ 25. Mr. Houston submitted the documentation required for his travel to the University of Tennessee to his supervisor, Principal Fay. *Id.* at 6, ¶ 23. Mr. Houston was the only APS employee, out of thousands, to be disciplined for traveling during the 2021 summer vacation. *Id.* at 14, ¶ 31.

Ordinary suspensions last up to three days. *Id.* at 12, ¶ 29. Under APS regulations, Mr. Smith's suspension of Mr. Houston for five days requires Mr. Smith to receive a recommendation from Mr. Houston's supervisor, the principal of Gateway. *Id.* Mr. Smith did not receive a recommendation from Gateway's principal, and Mr. Smith never approved a recommendation for Mr. Houston to be suspended. *Id.* Mr. Smith did not confirm the dates of the district-wide directive prohibiting staff from traveling because of the COVID-19 virus before disciplining Mr. Houston. *Id.* at 7, ¶ 25. Mr.

Smith told Mr. Houston that if he wanted to make it as a black administrator, he needed to learn how to "keep his head down." *Id.* at 5, ¶ 18.  Mr. Smith told Mr. Houston, "you're black, you can't do what white people do."  *Id.*

On May 17, 2022, the APS Board of Education voted not to renew Mr. Houston's contract.  *Id.* at 48, ¶ 66.  Half an hour before that vote, the board heard from black staff members who stated that they had been discriminated against, that they had seen other black staff members be discriminated against, and that, after being notified of the discrimination, APS leadership failed to address the issue.  *Id.* at 49–52, ¶ 67. Defendants Michael Carter, Tramaine Duncan, Debbie Gerkin, and Vicki Reinhard were members of the APS Board of Education at that time (the "director defendants"); each defendant voted not to renew Mr. Houston's contract.  *Id.* at 2, 52–53, ¶¶ 6–9, 71.  Ms. Gerkin and Mr. Duncan led the vote not to renew Mr. Houston's contract.  *Id.* at 52, ¶ 70.

On April 6, 2024, Mr. Houston filed suit.  *Id.* at 1.  Mr. Houston brings one claim under 42 U.S.C. § 1983 for racial discrimination in violation of 42 U.S.C. § 1981 against each defendant.[2]  *Id.* at 55, ¶¶ 76–78.  Mr. Houston alleges that the letter of reprimand and his nonrenewal were based on his race and interfered with his rights to make and enforce contracts with APS.  *See id.* at 29–30, ¶ 38 ("But for Mr. Houston being black he would have enjoyed the benefits, privileges, terms, and conditions of his contractual relationship.").

---

[2] Section 1983 "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989).

On June 10, 2024, defendants filed the motion to dismiss.  Docket No. 14.

Defendants argue that, as members of the school board, Mr. Carter, Mr. Duncan, Ms.

Reinhard, and Ms. Gerkin are entitled to qualified immunity and that Mr. Houston's

claims against them in their individual capacities should be dismissed.  *Id.* at 6–7.

Defendants assert that Mr. Houston has failed to state a claim against them in their

official capacities because he has failed to plausibly state a claim for municipal liability.

*Id.* at 11.  On July 2, 2024, Mr. Houston responded.  Docket No. 23.  Defendants replied

on July 16, 2024.  Docket No. 24.

## II.  LEGAL STANDARD

### A.  <u>Rule 12(b)(6)</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, a complaint must allege enough factual matter that, taken as true, makes

the plaintiff's "claim to relief . . . plausible on its face."  *Khalik v. United Air Lines*, 671

F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the

facts alleged, not that the facts themselves be plausible."  *RE/MAX, LLC v. Quicken*

*Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534

F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the

statement need only 'give the defendant fair notice of what the claim is and the grounds

upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting

*Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to

accept conclusory allegations.  *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th

Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or

legal conclusions.").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

## B. Section 1981

"Section 1981 prohibits racial discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  *Arnold v. Weld Cnty. Sch. Dist. RE-5J*, 677 F. Supp. 3d 1218, 1234 (D. Colo. 2023) (quoting 42 U.S.C. § 1981); *see also Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1532 (10th Cir. 1995).  "To prevail on a § 1981 discrimination claim, a plaintiff must show: (1) membership in a protected class; (2) the defendant intended to discriminate on the basis of race; and (3) the alleged discrimination interfered with a protected activity as defined in the statute (that is, making or enforcing a contract)."  *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1210 (10th Cir. 2022) (citing *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101–02 (10th Cir. 2001)); *see also Reynolds*, 69 F.3d at 1532 ("To make out a claim

under § 1981, Reynolds must show that Defendants intentionally or purposefully discriminated against her." (citing *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982)).

### C. Qualified Immunity

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916–17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional [or statutory] rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted). Courts are "permitted to exercise their

7

sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

## III. ANALYSIS

### A. Qualified Immunity

Defendants argue Mr. Carter, Mr. Duncan, Ms. Reinhard, and Ms. Gerkin are entitled to qualified immunity because Mr. Houston has failed to plausibly allege that they violated Mr. Houston's statutory rights under § 1981. Docket No. 14 at 6. They maintain that personal participation is an essential element of a § 1981 claim. *Id.* at 6–7 (citing *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996); *Perkins v. Fed. Fruit & Produce Co. Inc.*, 945 F. Supp. 2d 1225, 1254 (D. Colo. 2013)). Defendants contend that the complaint fails to plausibly allege that the director defendants personally participated in a violation of Mr. Houston's rights because it does not allege that their votes not to renew Mr. Houston's contract were based on his race. *Id.* at 7. Moreover, they argue that the director defendants cannot be held liable for ratifying Mr. Smith's recommendation not to renew Mr. Houston's contract, even if Mr. Smith's recommendation was discriminatory. *Id.* at 8 (citing *Dasgupta v. Harris*, 407 F. App'x 325, 330 (10th Cir. 2011) (unpublished)).

Mr. Houston responds that the director defendants can be held liable for ratifying Mr. Smith's discriminatory nonrenewal of Mr. Houston's contract under a "cat's paw" theory of liability. Docket No. 23 at 6. The "cat's paw" liability theory "allows a plaintiff to establish pretext even without evidence that the 'actual decisionmaker' possessed an unlawful motive." *Singh v. Cordle*, 936 F.3d 1022, 1038 (10th Cir. 2019) (citing *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015)). "An employer is liable for

discrimination under this theory if a subordinate to the decisionmaker 'performs an act motivated by discriminatory animus that is intended by the subordinate to cause an adverse employment action, and that act is a proximate cause of the ultimate employment action." *Id.* (alterations omitted) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (alterations and emphasis omitted)).  To state a claim under this theory of liability, Mr. Houston must plausibly allege that "(1) the subordinate took action motivated by discriminatory animus; (2) the subordinate intended the action to cause an adverse employment action, and (3) the subordinate's actions proximately caused the intended adverse employment action." *Id.*

Mr. Houston argues that he has plausibly alleged that Mr. Smith was biased and that his discriminatory recommendation caused Mr. Houston's contract not to be renewed.  Docket No. 23 at 7 (citing *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 484 (10th Cir. 2006)).  Mr. Houston claims that he was not permitted to file a grievance regarding Mr. Smith's letter of reprimand and recommendation not to renew Mr. Houston's contract.  *Id.*  Mr. Houston appears to argue that, by alleging he was unable to file a grievance, the complaint plausibly alleges that Mr. Smith's discriminatory conduct was the proximate cause of the non-renewal of Mr. Houston's contract.  *See id.* at 7–8 ("Michael Carter, Tramaine Duncan, Debbie Gerkin, and Vicki Reinhard relied exclusively on the say-so of the biased subordinate." (citation, quotation, and alterations omitted); *see also Singh*, 936 F.3d at 1038 ("If a final decisionmaker fires an employee based on 'uncritical reliance' on facts provided by a biased subordinate, the subordinate's bias is the proximate cause of the employment action.").

The Court finds that it is unnecessary to consider whether Mr. Houston has satisfied the first prong of the qualified immunity analysis. Even if Mr. Houston plausibly alleges that the director defendants violated his rights under a "cat's paw" theory, he has not shown that it was clearly established that a government official could be held liable under this theory. *Pearson*, 555 U.S. at 236 (courts have discretion to decide which prong of the qualified immunity analysis to address first).

To be clearly established, "[i]t is not enough that a rule be suggested by then-existing precedent; the 'rule's contours must be so well defined that it is clear to a reasonable [government official] that his conduct was unlawful in the situation he confronted.'" *Packard v. Budaj*, 86 F.4th 859, 868 (10th Cir. 2023) (quoting *City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 12 (2021)). Moreover, Mr. Houston cannot rely on a theory of respondeat superior, *Jett*, 491 U.S. at 736 ("we have rejected *respondeat superior* as a basis for holding a state actor liable under § 1983 for violation of the rights enumerated in § 1981"), nor can he rely solely on the fact that it was clearly established that the conduct of the subordinate was a statutory violation. *See Perry v. Durborow*, 892 F.3d 1116, 1123 (10th Cir. 2018). "Instead, to satisfy the second part of the qualified-immunity test in the context of [a] supervisory-liability claim," a plaintiff must show that, as of the date in question, "clearly established law . . . would . . . have put a reasonable official in [the supervisor's] position on notice that his *supervisory conduct* would" violate plaintiff's statutory rights. *Id.* (quoting *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015)).

The Tenth Circuit has held that, as early as 1996, "public officials had adequate notice that deciding not to renew an employee's teaching contract because of his race

10

would be in violation of his statutory rights." *Dasgupta*, 407 F. App'x at 331 (citing
*Ramirez v. Dep't of Corr.,* 222 F.3d 1238, 1244 (10th Cir. 2000) (holding law to be
clearly established in 1996)).  Moreover, Mr. Houston cites to nine decisions in courts of
appeals for the Third, Fourth, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits indicating
that "cat's paw" or "rubber stamp"[3] theories are viable in certain employment
discrimination cases.[4]  Docket No. 23 at 6–7; *see also BCI Coca-Cola Bottling Co.*, 450
F.3d at 484 (*"*Our sister circuits overwhelmingly have endorsed some version of these
doctrines").  However, even if the Court assumes that a "cat's paw" theory of liability
was an established theory of supervisory liability at the time the APS Board of
Education voted not to renew Mr. Houston's contract, *see Lawrence v. Sch. Dist. No. 1*,
No. 11-cv-02789-PAB-KMT, 2013 WL 1685715, at *10 (D. Colo. Apr. 18, 2013) ("The
Court assumes, without deciding, that cat's paw liability applies to Ms. Lawrence's
§ 1981 retaliation claim."), *aff'd*, 560 F. App'x 791 (10th Cir. 2014) (unpublished), he has

---

[3] "In the employment discrimination context, 'cat's paw' refers to a situation in
which a biased subordinate, who lacks decisionmaking power, uses the formal
decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment
action.  The 'rubber stamp' doctrine . . . refers to a situation in which a decisionmaker
gives perfunctory approval for an adverse employment action explicitly recommended
by a biased subordinate."  *BCI Coca-Cola Bottling Co.*, 450 F.3d at 484.  Although Mr.
Houston repeatedly refers to the cat's paw theory of liability in his response, he also
states that a "rubber stamp termination was policy and custom."  Docket No. 23 at 10.
Although both theories appear to apply to Mr. Houston's arguments, because Mr.
Houston's arguments center on the "cat's paw" theory of liability, the Court will focus its
discussion on the cat's paw theory of liability.  Moreover, for the reasons discussed
below, the Court's analysis would be no different as to a "rubber stamp" theory of
liability.
[4] A plaintiff can prove the law was clearly established if "the clearly established
weight of authority from other courts . . . have found the law to be as the plaintiff
maintains."  *Packard*, 86 F.4th at 867.

produced no support for the proposition that the director defendants can be held personally liable for their votes.

In *Crews v. Paine*, 686 F. App'x 540, 546 (10th Cir. 2017) (unpublished), the Tenth Circuit reversed the district court's denial of qualified immunity for a supervisor in a § 1981 action on the same basis.  In that case, the plaintiff was an armed patrol officer in the Department of Safety and Security for Denver School District No. 1.  *Id.* at 541. The plaintiff brought a racial discrimination claim under 42 U.S.C. §§ 1981 and 1983 against the department chief in his individual capacity for terminating the plaintiff from his position.  *Id.*  In denying qualified immunity, the "district court acknowledged that while the focus of the evidence of discriminatory motive concerned Sergeant Paine, it was Chief Eaton who actually made the decision to terminate Officer Crews.  But it dealt with this complication by invoking the 'cat's paw' doctrine."  *Id.* at 544.  The Tenth Circuit found that "[n]either the district court nor Officer Crews cite any authority holding an unbiased decisionmaker *personally* liable under § 1983 for an adverse action allegedly traceable to another's improper animus."  *Id.* at 546.  "Indeed, such a holding would appear contrary to basic limits on personal liability under § 1983, which, eschewing principles of respondeat superior, make 'each Government official only liable for his or her own misconduct.'"  *Id.* (alterations omitted) (quoting *Iqbal*, 556 U.S. at 677).  The court held that, in "the absence of precedent clearly establishing personal liability under § 1983 based on a cat's paw theory, Chief Eaton would be entitled to qualified immunity from liability on the basis of such a theory."  *Id.*

Mr. Houston points to no clearly established law that the director defendants can be held personally liable for their votes not to renew Mr. Houston's contract under 42

U.S.C. §§ 1981 and 1983.  Therefore, the Court finds that Mr. Carter, Mr. Duncan, Ms.

Reinhard, and Ms. Gerkin are entitled to qualified immunity and dismisses Mr.

Houston's claim against them in their individual capacities.

### B.  Municipal Liability

Municipalities may not be sued under 42 U.S.C. § 1983 on a theory of

respondeat superior for the actions of their employees.  *Monell v. Dep't of Soc. Servs. of*

*N.Y.,* 436 U.S. 658, 692 (1978).  Instead, local governing bodies can be sued directly

only where "the action that is alleged to be unconstitutional implements or executes a

policy statement, ordinance, regulation, or decision officially adopted and promulgated

by that body's officers."  *Id*. at 690.  "[I]t is when execution of a government's policy or

custom, whether made by its lawmakers or by those whose edicts or acts may fairly be

said to represent official policy, inflicts the injury that the government as an entity is

responsible under § 1983."  *Id*. at 694.  "[T]hese principles apply to § 1981 claims no

less than § 1983 claims, because Congress designed § 1983 to supply the remedies

when state actors violate the civil rights protected by § 1981."  *Lawrence v. Sch. Dist.*

*No. 1*, 560 F. App'x 791, 794–95 (10th Cir. 2014) (unpublished).

To state a claim for municipal liability under § 1983 for the actions of municipal

employees, a plaintiff must allege sufficient facts to demonstrate that it is plausible (1)

that the municipal employees committed a statutory violation and (2) that a municipal

policy or custom was the moving force behind the deprivation of rights.  *See Jiron v.*

*City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can

take the form of:

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to
> a widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or

usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

Defendants argue that Mr. Houston has failed to allege facts that demonstrate a municipal policy of discrimination was the moving force behind the non-renewal of his contract. Docket No. 14 at 11–15. Mr. Houston responds that his claims against the district are premised on the non-renewal of his contract, Mr. Smith suspending Mr. Houston without pay, and Mr. Smith placing a letter of reprimand in his personnel file. *See* Docket No. 23 at 2–8.

### 1. Mr. Smith as Final Policymaker

Mr. Houston maintains that Mr. Smith was the only person with authority to suspend Mr. Houston for more than three days, *id.* at 3, and that Mr. Smith's decision to reprimand and suspend Mr. Houston was not constrained by policy or reviewable by others. *Id.* at 4. As such, Mr. Houston argues that Mr. Smith had final policymaking authority concerning Mr. Houston's suspension and reprimand and that the school district is liable for Mr. Smith's conduct.[5] *Id.* at 3. Defendants respond that Mr.

---

[5] Defendants do not deny that Mr. Houston plausibly states a § 1981 claim against Mr. Smith. *See* Docket No. 24 at 7. Defendants state that Mr. Houston's response "spends considerable time alleging discriminatory animus and action on the part of Mr. Smith," but that "Mr. Smith's alleged conduct is only relevant insofar as it can be imputed onto the School District." *Id.* Defendants assert that the "allegations regarding Mr. Smith's actions in regard to Plaintiff's employment, and the motivations behind them, accordingly are not at issue here." *Id.* Therefore, the Court will assume that the complaint plausibly states a § 1981 claim against Mr. Smith by alleging (1) that Mr. Houston is black, (2) that Mr. Smith suspended Mr. Houston and placed a letter of reprimand in his personal file, (3) that Mr. Smith was motivated by racial animus, as evidenced by his comments regarding what Mr. Houston could do as a black

Houston's "conclusory statement regarding Mr. Smith's authority over reprimands is
insufficient to plausibly allege that he is a final policymaker."  Docket No. 24 at 3.

Courts look to state and local law to determine whether an official has final
policymaking authority.  *Jackson v. City & Cnty. of Denver*, 2022 WL 120986, at *4 (10th
Cir. Jan. 13, 2022) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) ("the
identification of policymaking officials is a question of state law"); *Ledbetter v. City of
Topeka*, 318 F.3d 1183, 1189 (10th Cir. 2003) ("in identifying final municipal
policymakers, the courts must examine state laws and local ordinances or regulations to
determine where the statutory law places the responsibility for making law or setting
policy in a particular area")).  "This determination may be made on [a] motion to
dismiss."  *Smith v. USD 480 Liberal*, 682 F. Supp. 3d 980, 991 (D. Kan. 2023).  In
undertaking this inquiry, courts "are interested only in delegations of legal power."
*Milligan-Hitt v. Bd. of Trs. of Sheridan Cnty. Sch. Dist. No. 2*, 523 F.3d 1219, 1227 (10th
Cir. 2008) (emphasis omitted).

"[T]hree factors help [courts] decide whether an individual is legally a final
policymaker for a municipality: (1) whether the official is meaningfully constrained by
policies not of that official's own making; (2) whether the official's decisions are final –
i.e., are they subject to any meaningful review; and (3) whether the policy decision

---

administrator, and (4) that the letter of reprimand interfered with Mr. Houston's ability to
make contracts with APS.  Docket No. 1 at 3, 5, 30, ¶¶ 13, 18, 39 ("To intentionally
interfere in the making of a contract with Mr. Houston, Mr. Smith placed a letter of
reprimand in Mr. Houston's personal file that was not legitimate."); *see also Cruz*, 42
F.4th at 1210 ("To prevail on a § 1981 discrimination claim, a plaintiff must show: (1)
membership in a protected class; (2) the defendant intended to discriminate on the
basis of race; and (3) the alleged discrimination interfered with a protected activity as
defined in the statute (that is, making or enforcing a contract).").

purportedly made by the official is within the realm of the official's grant of authority."
*Jackson*, 2022 WL 120986, at *4 (alterations omitted) (quoting *Brammer-Hoelte*r, 602
F.3d at 1189 (citation and quotation omitted)); *see also Patel v. Hall*, 849 F.3d 970, 979
(10th Cir. 2017).  The "relevant question is not whether an employee had final 'decision-
making' authority, it is whether an employee had final 'policymaking' authority."  *USD
480 Liberal*, 682 F. Supp. 3d at 992; *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d
664, 676 (7th Cir. 2009) ("[J]ust because Owen makes personnel decisions does not
necessarily mean that he is the *final* decisionmaker on such matters such that he can
be considered a policymaker for the Village in this area.  It is a 'well-established
principle that the mere unreviewed discretion to make hiring and firing decisions does
not amount to policymaking authority.  There must be a delegation of authority to set
policy for hiring and firing, not a delegation of only the final authority to hire and fire.'"
(quoting *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty., Ind.*, 183 F.3d 734, 739 (7th
Cir. 1999)).

Here, Mr. Houston argues that "Aurora Public School's Chief Personnel Officer
was vested by the school district with the authority to make final decisions."  Docket No.
23 at 3.  Mr. Houston cites Colo. Rev. Stat. § 22-32-110(k)(I), *id.*, which states that
Colorado school boards have the power to "adopt written policies, rules, and
regulations, not inconsistent with law, that may relate to the efficiency, in-service
training, professional growth, safety, official conduct, and welfare of the employees, or
any classification thereof, of the district."  Colo. Rev. Stat. § 22-32-110(k)(I).  Mr.
Houston also points to the reference in his complaint to APS regulations regarding the
suspension of administrators.  Docket No. 23 at 3 (referencing Docket No. 1 at 13 (citing

Discipline, Suspension and Dismissal of Administrators and Professional/Technical Employees, APS Code GCQF (Oct. 2021))).  APS Code GCQF states that an "immediate supervisor is authorized to issue written reprimands and to suspend an administrator . . . with or without pay for up to three days."  APS Code GCQF(IV).  The regulation further states that an "immediate supervisor may recommend to the division head and to the chief personnel officer, the Superintendent that an administrator . . . be suspended for longer than three days."  *Id.*, GCQF(V).  Finally, the regulation states that administrators "are not eligible to file grievances."  *Id.*, GCQF(VII)(C).  While the regulation does provide a process by which administrators may appeal a decision regarding a recommendation "for termination from all employment with the school district," this process does not apply to "lesser discipline such as demotion."  *Id.*, GCQF(VII)(D).

The Court finds that Mr. Houston has failed to plausibly allege that Mr. Smith was the final policymaker regarding the decision to suspend and reprimand Mr. Houston. Under Colorado law, each "school district shall be governed by a board of education." Colo. Rev. Stat. § 22-32-103(1).  The school board has the authority to "adopt written policies, rules, and regulations . . . that may relate to the . . . official conduct . . . of the employees . . . of the district."  Colo. Rev. Stat. § 22-32-110(k)(I).  The school board has delegated to the superintendent the authority "to compose and implement regulations relating to the suspension, discipline and termination of administrators."  APS Code GCQF.  This is distinct from other regulations that authorize the chief personnel officer to make policies and procedures on certain topics.  *See*, *e.g.*, Classified Staff Concerns/Complaints/Grievances, APS Code GBK (Aug. 2015) ("The chief personnel

officer is designated as the grievance officer for the school district.  It will be the function

of the officer to establish procedures and facilitate the processing of formal

grievances.").

        Considering the text of APS Code GCQF regarding suspensions and reprimands,

the phrase indicating that an "immediate supervisor may recommend to the division

head and to the chief personnel officer, the Superintendent that an administrator . . . be

suspended for longer than three days" is unclear as to the distinctions between the

division head, the chief personnel officer, and the superintendent.  APS Code GCQF(V).

However, other parts of regulation make clear that the superintendent and the chief

personnel officer are distinct offices and that the phrase "chief personnel officer, the

Superintendent" does not reference two titles for the same individual.  *See id.*,

GCQF(VI) ("The Superintendent and the chief personnel officer shall have the authority

to demote an administrator or professional/technical employee to a position for which

s/he is qualified.").  This is true even if the superintendent and chief personnel officer

share authority over certain disciplinary decisions.  *See id.*  Nevertheless, APS

designated the superintendent, not the chief personnel officer, to make official policy

regarding discipline.  Therefore, Mr. Houston's complaint alleges only that Mr. Smith

had "final 'decision-making' authority" not "final 'policymaking' authority."  *USD 480

Liberal*, 682 F. Supp. 3d at 991.  Thus, although the allegations in Mr. Houston's

complaint plausibly allege that Mr. Smith, as the chief personnel officer, was acting

within the realm of his authority when reprimanding Mr. Houston and that his decision is

final, he has not plausibly alleged that Mr. Smith was not "meaningfully constrained by

policies not of [his] own making."  *Jackson*, 2022 WL 120986, at *4.  Accordingly, the

complaint does not plausibly allege that the school board's delegation to Mr. Smith was
"such that he can be considered a policymaker for the [board] in this area." *Valentino*,
575 F.3d at 676; *but see Lytle v.* Carl, 382 F.3d 978, 982–86 (9th Cir. 2004) (finding that
assistant superintendent was final policymaker because (1) school board regulations
stated that the "Board of School Trustees does not have the authority to discipline
employees.  Discipline is a right reserved to the superintendent and other administrators
in accordance with the applicable negotiated agreements, laws, board policies, and
regulations" and because the assistant superintendent's "disciplinary decisions were not
subject to review by anyone within the District").  Therefore, Mr. Houston has failed to
plausibly allege that his suspension and reprimand represented an official policy of the
district such that the district is liable under *Monell*.

Mr. Houston also fails to demonstrate that the district is liable for Mr. Smith's
recommendation that Mr. Houston be terminated.  "With respect to termination,
Colorado law grants school boards the exclusive authority to terminate personnel unless
the board delegates its authority to another individual." *French v. Denver Pub. Sch.*,
No. 23-cv-01614-NYW-MDB, 2024 WL 5168139, at *5 (D. Colo. Dec. 19, 2024) (citing
Colo. Rev. Stat. § 22-32-110(1)(h)); *see also Singer v. Denver Sch. Dist. No. 1*, 959 F.
Supp. 1325, 1330 (D. Colo. 1997) ("Where a board of education retains authority to
review a decision, a delegation of final authority does not occur.").  Here, the applicable
APS regulations provide a means by which Mr. Houston can appeal his termination
decision to the board, as evidenced by the fact that the board ultimately voted on Mr.
Houston's termination.  *See* APS Code GCQF(VII)(D) ("If a nonlicensed,
nonprobationary administrator or professional/technical employee being recommended

for termination from all employment with the school district (as opposed to lesser discipline such as demotion) wishes to appeal that decision, he/she may do so through the following sequence of appeal."); Docket No. 1 at 48, ¶ 66 ("On May 17, 2022, the Board voted not to renew Mr. Houston's contract."). Therefore, the Court finds that Mr. Houston has not plausibly alleged that the school district can be liable under *Monell* for actions taken by Mr. Smith.

### 2. The School Board

Defendants argue that the district cannot be held liable for the school board's decision not to renew Mr. Houston's contract because Mr. Houston has not plausibly alleged that the school board ratified Mr. Smith's discriminatory actions. Docket No. 14 at 13. Defendants point out that a "municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific [discriminatory] actions, as well as the basis for these actions." *Id.* (emphasis omitted) (quoting *Bryson*, 627 F.3d at 790). Defendants maintain that, even if Mr. Houston has plausibly alleged that Mr. Smith's recommendation not to renew Mr. Houston's contract was motivated by racial animus, the complaint contains no allegations to suggest that the school board shared or ratified the animosity. *Id.*

Mr. Houston responds that, "[b]y using the Board to take action on his behalf, Mr. Smith non-renewed Mr. Houston's contract with APS and convinced the board to vote accordingly." Docket No. 23 at 4–5. Mr. Houston argues that the school district is liable for Mr. Smith's discrimination based on a "cat's paw" theory of liability for the school board's decision not to renew his contract. *Id.* at 6–8

Mr. Houston presents no case establishing that a "cat's paw" theory of liability is applicable under § 1983 as a means of establishing a municipal policy or practice of

20

discrimination that subjects the municipality to liability.  Although not cited by Mr.

Houston, in *Nagle v. Marron* the Second Circuit considered whether a school district

could be held liable under a "cat's paw" theory for failing to provide a teacher with

tenure.  663 F.3d 100, 116–18 (2d Cir. 2011).  The court found that the Supreme

Court's decision in *Staub*, 562 U.S. at 422, supported the proposition that "cat's paw"

liability was applicable under § 1983.  *Nagle*, 663 F.3d at 117 n.16.  In *Staub*, the

Supreme Court held that, under the Uniformed Services Employment and

Reemployment Rights Act ("USERRA"), "if a supervisor performs an act motivated by

antimilitary animus that is *intended* by the supervisor to cause an adverse employment

action, and if that act is a proximate cause of the ultimate employment action, then the

employer is liable under USERRA."  *Staub*, 562 U.S. at 422.  The *Nagle* court found that

"USERRA is 'very similar to Title VII'" and that the court frequently analogizes Title VII to

§ 1983.  *Nagle*, 663 F.3d at 117 n.16.  The court also indicated that "several Circuits

have either held or assumed that cat's paw liability would be available under § 1983."

*Id.* at 117 (collecting cases from the Sixth, Seventh, and Eighth Circuits).  However, the

court decided not to resolve the issue because the district court had made other

reversible errors and remanded the case for further proceedings.  *Id.*

More recent precedent suggests that a "cat's paw" theory of liability is

inapplicable under § 1983 because the theory relies on respondeat superior principles.

For example, in *Bose v. Bae*, 947 F.3d 983, 991 (6th Cir. 2020), the plaintiff

"suggest[ed] that the cat's paw theory does not require the application of respondeat

superior principles" to her Title IX claim under 20 U.S.C. §§ 1681–88.  Instead, the

plaintiff contended that "the cat's paw theory is a doctrine of causation; it simply draws a

causal link between the discriminatory animus of one individual and the adverse action

of another." *Id.* According to the plaintiff, "cat's paw does not impute liability; it is

merely a 'conduit theory.'" *Id.* (citation omitted). The Sixth Circuit rejected this argument

because it "fail[ed] to see the distinction." *Id.* The court stated:

> The Supreme Court in *Gebser* [*v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998),] held that an educational institution is responsible under Title IX only for its "own official decisions." Bose argues that she seeks to hold Rhodes liable for its own decision – expelling her. But that decision only violated Title IX if it was made "on the basis of sex" – that is, if the decision was taken for a discriminatory reason. Bose has no evidence of any discriminatory motive on Rhodes' part; she, therefore, asks us to hold Rhodes responsible for *Bea's* retaliatory animus. But that would be to hold Rhodes liable "for its employees' independent actions" – precisely what *Gebser* forbids.

*Id.* (internal citations and alterations omitted). This is consistent with the Tenth Circuit's

observation that holding a government official individually liable under a cat's paw

theory would be "contrary to basic limits on personal liability under § 1983, which,

eschew[s] principles of respondeat superior." *Crews*, 686 F. App'x at 546; *see also Bd.*

*of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 415 (1997) ("Where a

court fails to adhere to rigorous requirements of culpability and causation, municipal

liability collapses into *respondeat superior* liability.").

Given that the Supreme Court has "rejected *respondeat superior* as a basis for

holding a state actor liable under § 1983 for violation of the rights enumerated in

§ 1981," *Jett*, 491 U.S. at 736, and that the Tenth Circuit has held that a municipality

can only be liable for an employee's decision if the decision is ratified by a final

policymaker, including the basis for the decision, *Bryson*, 627 F.3d at 788, the Court

rejects Mr. Houston's argument that the district can be held liable under a "cat's paw"

theory of liability.

Moreover, Mr. Houston has failed to plausibly allege that the school board ratified

Mr. Smith's discriminatory basis for recommending that Mr. Houston's contract not be

renewed. The complaint alleges that the letter of reprimand states that Mr. Houston's

contract will not be renewed because he failed to follow APS COVID-19 directives

regarding staff travel. Docket No. 1 at 6, ¶ 24. The complaint states that, before voting

not to renew Mr. Houston's contract, board members heard from staff members who

indicated that they had been discriminated against, but that the board proceeded not to

renew his contract. *Id.* at 48–52, ¶¶ 66–67. The complaint contains no allegations that

the board knew about Mr. Smith's alleged racial animus towards Mr. Houston.[6] As

such, the complaint fails to plausibly allege that the board ratified Mr. Smith's

recommendation not to renew Mr. Houston's contract based on Mr. Houston's race.

Therefore, Mr. Houston has failed to show that the district is liable for the board's

decision not to renew Mr. Houston's contract.[7]

Because Mr. Houston has failed to plausibly allege that Mr. Smith was the final

policymaker regarding Mr. Houston's discipline or that the school board ratified Mr.

Smith's allegedly discriminatory recommendation not to renew Mr. Houston's contract,

---

[6] In the complaint, Mr. Houston alleges that Ms. Gerkin did not social distance
during campaign events for her reelection to the school board. Docket No. 1 at 54,
¶ 75. This allegation does not plausibly allege that Mr. Houston's failure to comply with
COVID-19 policies was a pretext for any board member not to renew Mr. Houston's
contract.

[7] Mr. Houston's response also alleges that APS "had a policy and custom of
depriving employees of a meaningful opportunity to be heard." Docket No. 23 at 9. Mr.
Houston points to the fact that APS administrators cannot file grievances for discipline
that does not result in termination. *Id.*; *see also* Docket No. 1 at 14, ¶ 32 ("Mr. Houston
was not eligible to file a grievance because he was an administrator"). Nothing in Mr.
Houston's complaint suggests that this is the basis for his § 1981 racial discrimination
claim. The Court will not consider whether the school district can be liable for failing to
have a grievance process for certain disciplinary decisions.

Mr. Houston has failed to demonstrate that a municipal policy or custom of racial discrimination was the moving force behind the non-renewal of his contract. *Bryson*, 627 F.3d at 788. Therefore, Mr. Houston has not stated a claim against the school district or the defendants in their official capacities. Given that Mr. Houston has failed to state a § 1981 claim against the director defendants in their individual capacities or against all the defendants in their official capacities, the Court grants the motion to dismiss.

## IV.   CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the Defendants' Partial Motion to Dismiss [Docket No. 14] is **GRANTED**. It is further

**ORDERED** that plaintiff's claim against defendants Michael Carter, Tramaine Duncan, Debbie Gerkin, and Vicki Reinhard in their individual capacities is **DISMISSED with prejudice**.[8] It is further

**ORDERED** that plaintiff's claim against all defendants in their official capacities is **DISMISSED without prejudice**. It is further

---

[8] *See Clark v. Wilson*, 625 F.3d 686, 692 (10th Cir. 2010) (instructing district court to dismiss based on qualified immunity "with prejudice"); *Lybrook v. Members of the Farmington Mun. Schs. Bd. of Educ.*, 232 F.3d 1334, 1341-42 (10th Cir. 2000) (affirming district court order granting motion to dismiss with prejudice on qualified immunity grounds); *see also Neil v. City of Lone Tree*, No. 23-cv-01155-RMR-SBP, 2024 WL 4204142, at *14 n.14 (D. Colo. Aug. 28, 2024), *report and recommendation adopted*, 2024 WL 4252820 (D. Colo. Sept. 20, 2024) (discussing dismissals with prejudice for qualified immunity challenges).

1 of 25

**ORDERED** that defendants Michael Carter, Tramaine Duncan, Debbie Gerkin, and Vicki Reinhard are **DISMISSED** from this case.

DATED March 10, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge